# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD B. MELBYE, also known as Brent Melbye,<br><br>                       Plaintiff,<br>   vs.<br><br>ACCELERATED PAYMENT TECHNOLOGIES, INC., a Delaware corporation; and DOES 1-10, inclusive,<br><br>                       Defendants. | CASE NO. 10cv2040 – IEG (JMA)<br><br>ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT<br><br>[Doc. No. 35] |

This is an employment action alleging breach of contract for failure to pay post-termination wage commissions. Currently before the Court is Defendant Accelerated Payment Technologies, Inc. ("APT")'s motion for summary judgment. Having considered the parties' arguments, and for the reasons set forth below, the Court **GRANTS IN PART and DENIES IN PART** the motion.

## BACKGROUND

This suit arises from Plaintiff Richard B. Melbye's employment by Defendant's predecessor, CAM Data Systems (later renamed CAM Commerce Solutions, and hereinafter referred to as "CAM Commerce"). CAM Commerce was formed by Melbye's college friend, Geoffrey Knapp. After he graduated college, Melbye joined CAM Commerce as a salesman. At that time, CAM Commerce sold "point of sale" ("POS") hardware and software for small retailers.

1 According to Knapp, Melbye quickly became a good salesman and, within a short time, was a top
2 performer. (Knapp Depo. 116:19-23 (Pl. Opp., Ex. 6).) By 2000, Melbye had been earning more
3 than $200,000 a year in commissions for sales of POS systems. (Knapp Depo. 12:9-11 (Pl. Opp.,
4 Ex. 7).) Knapp called Melbye a "big part of the success of the company early on and later."
5 (Knapp Depo. 11:1-4 (Pl. Opp., Ex. 8).)

6 Around 2001, CAM Commerce developed "X-Charge," a software program that allowed
7 retailers to process credit cards directly from their computerized cash registers, without the need to
8 buy a separate card reader. X-Charge amplified and speeded up the payment process. CAM
9 Commerce's approach was to identify specialty software developers in certain retail industries,
10 such as dry cleaners, salons, tire stores, dentists, and veterinarians, and convince them to integrate
11 X-Charge into their respective software for managing those businesses. CAM Commerce would
12 give away X-Charge software for free, in exchange for the oppourtnity to sell payment processing
13 services to the reseller's customers. (Knapp Depo. 13:22-14:22 (Pl. Opp., Ex. 11).)

14 Knapp asked Melbye to be the one to go out, find resellers, and make these "sales." After
15 the "sale" was made, it could take years before it would result in any revenue to CAM Commerce.
16 As such, Knapp convinced Melbye to trade his current income for a new plan that offered residual
17 commissions. (Knapp Depo. 12:9-19 (Pl. Opp., Ex. 13).) Knapp told Melbye that "this is going to
18 be better for you in the long run." (*Id.*) He promised Melbye that Melbye would be able to build a
19 "long-term residual income" that would allow him to share in the success of the business, similar
20 to stock options or continuing profits on insurance renewals. (Knapp Depo. 15:15-21, 16:1-23 (Pl.
21 Opp., Ex. 14).) As long as the company kept earning money from that customer, Melbye wold get
22 his small percentage, graduating down to one percent and staying there. (*Id.* at 16:1-23.) The
23 company benefitted by keeping the remaining revenue. (Melbye Decl. ¶ 8 [Doc. No. 45-1].)

24 Knapp believed that other companies took advantage of their employees, and therefore his
25 philosophy as the CEO of CAM Commerce was that his company would be different, to attract
26 and keep good sales talent. (Knapp Depo. 42:1-43:6 (Pl. Opp., Ex. 15).) Knapp realized that after
27 the employees had amassed sizable commissions, it might seem that they are "worth more dead
28 than alive" to the company. (Knapp Depo. 43:7-22 (Pl. Opp., Ex. 16).) Therefore, he was very

1  clear in telling his employees, including Melbye, that the company was not going to fire them just
2  to take their commissions away. (*Id.*) At his deposition, Knapp indicated that it was his intention
3  that if an employee was fired without cause, the employee would get to keep collecting the
4  commissions. (*Id.*) Similarly, according to Melbye, the agreement between him and the company
5  was that: (a) his commissions are still his if he is terminated without cause, and (b) the company
6  wasn't going to fire him to take his money away. (Melbye Decl. ¶ 9.)

7  Because there would be a long lag between recruiting a reseller and collecting revenue,
8  Knapp set up an initial commission schedule for his employees that paid a higher percentage from
9  the first several years. Knapp explained this declining scale in his May 19, 2003 email to Melbye
10 and others:

11  When a reseller brings in a new account the sales rep will get 6% of the first years [sic] processing from that account, 5% for the 2nd year, 4% for the 3rd year,
12  3% for 4th year and 2% for the 5th year and 1% thereafter. If the rep makes quota (to be determined), the percentage will jump up to 1% for all years for all accounts
13  signed up during that year.

14 (Pl. Opp., Ex. 20; *see also* Knapp Depo. 38:1-40:24 (Pl. Opp., Ex. 17); Melbye Decl. ¶ 10.)

15  The May 19, 2003 email contained the following language regarding termination: "You
16 must be employed by the company to continue receiving the commissions, i.e. if you quit or are
17 fired for "cause (stealing, etc.) you don't get to keep collecting the commissions." (Pl. Opp., Ex.
18 20.) In their depositions, Knapp and Melbye indicated that they understood this language to mean
19 that if Melbye was terminated without cause, he had a right to continued residual commissions.
20 (*See* Melbye Depo. 194:4-195:19 (Pl. Opp., Ex. 18); Knapp Depo. 43:7-22 (Pl. Opp., Ex. 18); *see*
21 *also* Melbye Decl. ¶¶ 11, 12.) In other words, Melbye's right to receive commission would
22 terminate only if he (a) quit, or (b) was fired for cause. (*See* Melbye Depo. 194:4-195:19 (Pl.
23 Opp., Ex. 18).) Knapp reiterated these "contractual commitments" to Melbye on a number of
24 occasions.[1] (*See* Melbye Decl. ¶ 13; *see also* Knapp. Depo. 44:4-24, 47:14-23 (Pl. Opp., Ex. 22).)

25  On April 26, 2006, Melbye signed a form acknowledging that he was an at-will employee

26

27  [1] In 2007, the commission percentages changed, but the overall plan remained the same. As of April 2007, rather than have a six-tiered commission structure starting at 6% and dropping 1% per
28  year, the commission would be 3% for five years, and then 1% thereafter. This change only affected new accounts signed on or after April 2007.

1 and that he received the company's Employee Handbook:

2         I agree that I am employed by CAM on an at-will basis, and that my employment can be terminated at any time with or without cause or advance notice, either by CAM or me. This agreement supersedes all prior agreements, promises, or understandings concerning termination of my employment.

        I also acknowledge that I have received a copy of the Employee Handbook and have read and understood all of its provisions. This includes reading and understanding CAM Commerce Solutions' Code of Business Conduct & Ethics and CAM's Compliance Program.

        I acknowledge that CAM retains the right and sole discretion to modify, delete, or add to any of the policies set forth in the Handbook, except for the agreement that my employment can be terminated at will, which can only be changed in a formal written contract signed by me and the Chief Executive Officer of CAM. I understand that no supervisor has the authority to modify, delete, or add to the policies in the Handbook, and that in the event of a conflict between the terms of the Handbook and anything told to me by a supervisor or co-employee, the terms of the Handbook shall control.

(Awrey Dcl., Ex. C [Doc. No. 35-1].) In the section on "Sales Commission Policy," the Employee Handbook provided as follows:

        Some employees will be eligible for commissions. Commissions will be earned when products are shipped and payment is received from the client. Commissions will be paid on the paycheck following CAM's receipt of payment from the client. Commissions for products shipped prior to termination of employment will be forwarded once payment is received from the client. If the contract has been signed, but the order has not yet shipped prior to the last day of employment, the commission will be split 50/50 with the Sales Representative who takes over the account.

        Eligibility for any commission ends on the last day of employment. Therefore, commission will not be paid for credit card processing revenue for any dates following the end of your employment.

(Awrey Decl., Ex. D.) According to Melbye, he was required to acknowledge receipt of the Employee Handbook if he wanted to keep his job. (Melbye Decl. ¶ 15; *see also* Knapp Depo. 62:15-63:12 (Pl. Opp., Ex. 25).) Nonetheless, he was reassured by Knapp that this did not change their agreement because Melbye was not on the kind of plan referred to in the Handbook. (Melbye Decl. ¶ 15; *see also* Knapp Depo. 47:4-23 (Pl. Opp., Ex. 26).)

Some time before January 30, 2007, Melbye asked Knapp for a document that would protect him in the event Knapp was "hit by a bus" and the future CEO decided not to honor Knapp's promises. (Knapp Depo. 31:1-22 (Pl. Opp., Ex. 27).) On January 30, 2007, Melbye and CAM Commerce entered into a Change of Control Agreement ("COC Agreement"), which

provided that Melbye would be paid a lump sum if he was terminated without cause.  (COC Agreement ¶ 7.4.1(ii) (Awrey Decl., Ex. E).)  However, according to Melbye and Knapp, due to a drafting error, and in contravention of the agreement's specific purpose, the COC Agreement indicated in § 6 that it could be canceled or terminated unilaterally by the company after a change of control.  (Melbye Decl. ¶ 17; Knapp Depo. 176:4-18, 177:5-178:19 (Pl. Opp., Ex. 29).)  According to Melbye, the provision in § 6 contradicted the provision in § 12.1, which provided that the COC Agreement "may be modified only by a written instrument duly executed by the Executive and the Board."  (*See* Melbye Decl. ¶ 18.)  At his deposition, Knapp indicated that he might not have reviewed Melbye's agreement closely, and therefore was unaware of the unilateral termination provision.  (Knapp Depo. 179:19-23 (Pl. Opp., Ex. 30); Knapp Depo. 177:5-178:19, 181:14-25 (Pl. Opp., Ex. 31).)  Melbye indicates that he would not have signed the COC Agreement if § 6 would have been brought to his attention.  (Melbye Decl. ¶ 18.)

Great Hill Equity Partners purchased CAM Commerce in 2008.  On June 1, 2008, during the due diligence leading up to the sale, Knapp told Great Hill Partners that CAM Commerce had required its employees to sign new employment contracts setting forth that "commissions are only earned on revenue that is obtained while they are employed."  (Awrey Decl., Ex. F.)  According to Knapp, this was designed "in part to address any long term exposure to paying out commissions on continuing revenue from accounts signed up by reps who have departed (for whatever reason)."  (*Id.*)  At the same time, Knapp specifically indicated that Melbye "ha[d] a separate employment agreement that addresses a pay out," which he saw as "a worst case scenario."  (*Id.*)

Knapp indicated that he also made it "crystal clear" to Great Hill Partners that the deal depended on them keeping the company as is and not trying to terminate any of the employees.  (Knapp Depo. 55:14-57:4 (Pl. Opp., Ex. 32).)  According to Knapp, he specifically mentioned Melbye and indicated that the agreement with him was that he would continue earning commissions even after termination.  (Knapp Depo. 222:3-223:16 (Awrey Decl., Ex. K).)

On December 10, 2008, shortly before leaving the company, Knapp sent a letter to Robyn Thompson, Vice President of Human Resources at CAM Commerce, addressing his concerns regarding salesperson compensation after his departure as the CEO.  Notably, Knapp wrote to

express his concern that the new management might "take away what the sales people had worked so hard for in the form of future commissions." (Awrey Decl., Ex. G.) He discussed how he built a culture at CAM Commerce that "encouraged sales people to take a lower salary than they might otherwise be able to get" because the company "gave them the opportunity to build a residual income." (*Id.*) He indicated that his belief was that the company was obligated to pay post-termination commissions to its employees. (*Id.*) He reiterated that the only reason the company was so successful and would continue to be successful was because the employees took lower salaries at the beginning, with the idea of receiving a continuous stream of commissions:

> We built a sales culture at CAM with X-Charge that encouraged sales people to take a lower salary than they might otherwise be able to get in the market because we gave them the opportunity to build a residual income. . . . An employee who leaves would actually have lots of sales they were paid nothing on depending on when they were approved, installed and went live. This is obviously unfair. And we didn't give the employee a choice in signing the new agreement. If they wanted to work at CAM, they needed to sign it. . . .
>
> . . . .
>
> It is my passionate belief that we made a commitment to each and every sales person that if they worked hard and paid their dues, they could build up an income stream at CAM, and thus that this income stream belongs to them even if they leave the company (especially if they are terminated) because the commissions represent sales they have already made that have not been fully paid out yet. It isn't like if they leave CAM the company has to give the commission to another rep. The company just pockets the money. . . .
>
> If it were me I would change the employment agreement to at least state that if they are terminated for any reason other than cause that they will continue to receive their commission payments on their sales. This would create a lot of goodwill and most important it is the right thing to do. Given that the employee would likely win a challenge, why not do it? And if I am ever asked to opine on what the commitment was to the employees you know what that opinion would be, regardless of the employment contract we make them sign (that they really don't understand or have any say in).

(*Id.*)

Also, just before Knapp left the company, the company posted a document entitled "CAM Commerce Solutions Incentive Programs" ("Incentives Document"), setting forth the compensation plans for all salespeople, including Melbye. As to Melbye, the document provided:

**X-Charge Business Development Plans**

The Business Development Team of three works to bring Resellers to the Company. Their plans vary by individual.

> . . . .
>
> Richard "Brent" Melbye has two different plans based upon when the account became active. For reseller accounts that were active prior to 4/1/2007, he is paid residual commission based upon the following tiers:
>
> - Active date less than one year, commission rate is 6%
> - Active date less than two years, commission rate is 5%
> - Active date less than three years, commission rate is 4%
> - Active date less than four years, commission rate is 3%
> - Active date less than five years, commission rate is 2%
> - Active date more than five years and beyond, commission rate is 1%
>
> For reseller accounts that are active after April 1, 2007 Brent's commission rate is 3% each month for the first 5 years, then 1% thereafter. In addition, Brent is paid 10% on the system accounts that he signed up when he was System Sales Rep.
>
> . . . .
>
> ***Payment following termination:*** **Business Development Reps will stop earning commission upon their last date worked. We will prorate their final month's commission amount based upon the number of days worked during that month. For example, if a Business Development Rep leaves on the 15th of April, they will be paid 50% of their normal commission amount for that month on the May 31 payroll.**

(Awrey Decl., Ex. B (emphasis in original).) Melbye indicates that this document was posted in the data room during the due diligence period, that he never saw it, and that it was only meant to protect the new company moving forward. (Melbye Decl. ¶ 20.)

On December 22, 2008, Roy Banks, the new CEO of CAM Commerce, sent a letter to Melbye terminating the COC Agreement pursuant to § 6 thereof. (Awrey Decl., Ex. H.) Although the company offered Melbye a new contract, Melbye ultimately rejected it. On March 31, 2010, the company (which, by that time, has changed its name to APT) terminated Melbye's employment, paying him only his salary through March 31, 2010 and his commissions from the revenue received through March 2010. (Awrey Decl., Ex. I.)

Melbye filed his complaint on September 2, 2010 in the Superior Court for the County of San Diego, alleging nine causes of action: (1) breach of contract, (2) unconscionable contract; (3) prevention of performance; (4) breach of the implied covenant of good faith and fair dealing; (5) unjust enrichment; (6) unfair competition; (7) failure to pay wages when due; (8) labor code penalties; and (9) declaratory relief. Defendant APT filed an answer and then removed the suit to this Court. Defendant filed this motion for summary judgment on November 18, 2011. On

December 22, 2011, the Court denied Melbye's motion for leave to amend the complaint. Melbye then filed an opposition to the current motion, and Defendant APT replied.[2] The Court heard oral argument on the motion on January 9, 2012.

## LEGAL STANDARD

Summary judgment is proper where the pleadings and materials demonstrate "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material issue of fact is a question that a trier of fact must answer to determine the rights of the parties under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears "the initial responsibility of informing the district court of the basis for its motion." *Celotex*, 477 U.S. at 323. To satisfy this burden, the movant must demonstrate that no genuine issue of material fact exists for trial. *Id.* at 322. Where the moving party does not have the ultimate burden of persuasion at trial, it may carry its initial burden of production in one of two ways: "The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000). To withstand a motion for summary judgment, the non-movant must then show that there are genuine factual issues which can only be resolved by the trier of fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 738 (9th Cir. 2000). A party asserting that a fact cannot be or is genuinely disputed cannot rely solely on its pleadings, but must support that assertion with affidavits, depositions, or answers to interrogatories. Fed. R. Civ. P. 56(c)(1); *see also Celotex*, 477 U.S. at 324.

The court must review the record as a whole and draw all reasonable inferences in favor of

---

[2] In conjunction with its reply, Defendant filed evidentiary objections to Melbye's Declaration and a motion to strike Melbye's Declaration. [Doc. No. 46-1.] Having considered the evidentiary objections, the Court hereby **OVERRULES** them and **DENIES** the motion to strike.

the non-moving party. *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). To avoid summary judgment, the non-moving party need not produce evidence in a form that would necessarily be admissible at trial. *Celotex*, 477 U.S. at 324. However, unsupported conjecture or conclusory statements are insufficient to defeat summary judgment. *See Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1103 (9th Cir. 2008); *Hernandez*, 343 F.3d at 1112.

## DISCUSSION

Melbye's first cause of action alleges that Defendant APT breached an oral agreement by refusing to pay him post-termination commissions. Melbye's second cause of action alleges that to the extent he had to remain employed to continue receiving his commissions, such provision in a contract is unconscionable. His third cause of action alleges that to the extent he had to remain employed to continue receiving his commissions, Defendant prevented his performance by terminating his employment. Melbye's fourth cause of action alleges that Defendant breached the covenant of good faith and fair dealing by terminating him for the sole purpose of avoiding the obligation to pay him commissions. His fifth cause of action alleges that Defendant has been unjustly enriched by receiving substantial revenue from third parties under the reseller contracts that Melbye sold while employed by CAM Commerce. Melbye's sixth cause of action alleges that Defendant's termination of his employment solely to avoid paying the commissions violated California's unfair competition law ("UCL"), Cal. Bus. & Prof. § 17200 et seq. His seventh cause of action alleges that Defendant violated the California Labor Code by failing to pay him post-termination commissions, which amount to "wages" under the Labor Code. Melbye's eighth cause of action seeks Labor Code penalties for failure to pay the commissions. His ninth cause of action seeks declaratory relief as to his right to receive post-termination commissions.

**I.     Breach of contract**

Defendant seeks summary judgment on the first cause of action by arguing that Melbye is not entitled to post-termination commissions because: (a) his employment was at-will and no written contract governed his employment; (b) the only written documents governing Melbye's employment, the Employee Handbook and the Incentives Document, explicitly state that he is not entitled to post-termination commissions; and (c) there was no oral contract between Melbye and

APT. In opposition, Melbye contends that summary judgment should be denied because there are genuine issues of material fact as to the following issues: (a) the existence of an oral agreement between him and CAM Commerce, which pre-dated the written policy documents; and (b) the applicability to him of the Employee Handbook and the Incentives Document.

### A. Existence of an oral or implied-in-fact agreement

It appears that there are genuine issues of material fact in this case as to the existence of an oral or implied-in-fact agreement, and therefore summary judgment is not appropriate at this time. In *Foley v. Interactive Data Corporation*, 47 Cal. 3d 654 (1988), the California Supreme Court considered whether, despite the presumption that employment in California is "at-will" and in the absence of an express written or oral contract term concerning termination of employment, the plaintiff could nonetheless show that there existed an agreement that he would only be terminated for good cause. The California Supreme Court indicated that the presumption of at-will employment could be overcome by evidence of contrary intent:

> Generally, courts seek to enforce the actual understanding of the parties to a contract, and in so doing may inquire into the parties' conduct to determine if it demonstrates an implied contract. "It must be determined, as a question of fact, whether the parties acted in such a manner as to provide the necessary foundation for an implied contract, and evidence may be introduced to rebut the inferences and show that there is another explanation for the conduct."

*Id.* at 677 (citations omitted). According to the California Supreme Court, "[s]uch implied-in-fact contract terms ordinarily stand on equal footing with express terms." *Id.* at 677-78.

In *Foley*, the California Supreme Court delineated a number of factors a court could consider in determining whether an implied-in-fact agreement exists:

> In the employment context, factors apart from consideration and express terms may be used to ascertain the existence and content of an employment agreement, including "the personnel policies or practices of the employer, the employee's longevity of service, actions or communications by the employer reflecting assurances of continued employment, and the practices of the industry in which the employee is engaged."

*Id.* at 680 (citation omitted). Analyzing the "totality of the circumstances" in *Foley*, the California Supreme Court concluded that the plaintiff adequately alleged the existence of an implied-in-fact agreement where he alleged "repeated oral assurances of job security and consistent promotions, salary increases and bonuses during the term of his employment contributing to his reasonable

1 expectation that he would not be discharged except for good cause." *Id.* at 681.

2 　　　In this case, Melbye has presented sufficient evidence to establish a triable fact as to the
3 existence of an oral or an implied-in-fact agreement. Unlike *Foley*, Melbye affirmatively states in
4 his declaration that there was an *express* oral contract in this case providing that he will be paid
5 post-termination commissions, unless he quit or was terminated for cause. (*See* Melbye Decl. ¶ 9.)
6 Moreover, looking at the totality of the circumstances, it appears there is at least a genuine issue of
7 material fact as to the "understanding of the parties to a contract." *See Foley*, 47 Ca. 3d at 677,
8 680-81. Just like in *Foley*, Melbye has presented evidence of "repeated oral assurances" that he
9 would not lose his commissions upon termination, unless he is terminated for good cause, which
10 would have given rise to "reasonable expectation" that he is entitled to post-termination
11 commissions. *See id.* at 681. For example, Knapp convinced Melbye to take a lower salary in
12 2001, with the expectation that Melbye would build a "long-term residual income." (*See* Knapp
13 Depo. 12:9-19, 15:15-21, 16:1-23.) In his deposition, Knapp indicated that the understanding was
14 that the company would not fire its employees to take away their commissions and that even if
15 fired, the employees would be entitled to post-termination commissions, unless fired for good
16 cause. (*See* Knapp Depo. 43:7-22.) Knapp allegedly memorialized this understanding in his May
17 19, 2003 email to the employees. (*See* Pl. Opp., Ex. 20; *see also* Knapp Depo. 38:1-40:24, 43:7-
18 22.) According to both Knapp and Melbye, Knapp reiterated these contractual commitments to
19 Melbye on a number of occasions. (*See* Melbye Decl. ¶ 13; Knapp Depo. 44:4-24, 47:14-23.)

20 　　　Defendant's arguments to the contrary are not persuasive. For example, Defendant points
21 to a sentence from Melbye's deposition, where Melbye supposedly states that he does not recall if
22 he had a specific conversation with Knapp or anyone else about receiving post-termination
23 commissions. (*See* Melbye Depo. 188:19-189:3.) However, at most, this raises a disputed issue of
24 material fact, which is inappropriate for the Court to resolve at the summary judgment stage. *See*
25 *Anderson*, 477 U.S. at 249-50. Similarly, purporting to cite to Knapp's deposition, Defendant
26 argues that it is clear that there was no oral agreement to pay Melbye post-termination
27 commissions and that, even if there was, Knapp never told Great Hill Partners about it. (*See*
28 Knapp Depo. 222:17-223:16, 227:22-228:4.) Even if this is the correct reading of those portions

of Knapp's deposition, they are at the very least in conflict with other portions of Knapp's deposition, where he resolutely states that there was an agreement with Melbye, that it was his belief that the company should keep to that agreement, and that he clearly told Great Hill Partners about the agreement. (*See* Knapp Depo. 43:7-22, 55:14-57:4, 222:3-223:16.) The portions of Knapp's deposition cited by Defendant are also in conflict with Knapp's December 10, 2008 letter, discussing the employees' right to post-termination commissions. (*See* Awrey Decl., Ex. G.)

Accordingly, Melbye has sufficiently demonstrated that there are at least genuine issues of material fact going to the existence of an oral or an implied-in-fact agreement in this case.

### B. Company's written policies

There are also genuine issues of material fact as to whether the Employee Handbook and the Incentives Document defeat Melbye's breach of contract cause of action. "When an employer promulgates formal personnel policies and procedures in handbooks, manuals, and memoranda disseminated to employees, a strong inference may arise that the employer intended workers to rely on these policies as terms and conditions of their employment, and that employees did reasonably so rely." *Guz v. Bechtel Nat'l Inc.*, 24 Cal. 4th 317, 344 (2000). Each case, however, must "turn[] on its own facts." *Id.* at 337. Thus, according to the California Supreme Court:

> Where there is no express agreement, the issue is whether other evidence of the parties' conduct has a "tendency in reason" to demonstrate the existence of an actual mutual understanding on *particular* terms and conditions of employment. If such evidence logically permits conflicting inferences, a question of fact is presented. But where the undisputed facts negate the existence or the breach of the contract claimed, summary judgment is proper.

*Id.* (internal citations omitted). On the one hand, written policies and provisions, such as in personnel handbooks, manuals, or memoranda, "do not bar, or necessarily overcome, other evidence of the employer's contrary intent." *Id.* at 339 (citations omitted). "The reasoning, express or implied, is that parol evidence is admissible to explain, supplement, or even contradict the terms of an unintegrated agreement, and that handbook disclaimers should not permit an employer, at its whim, to repudiate promises it has otherwise made in its own self-interest, and on which it intended an employee to rely." *Id.* On the other hand, provisions "in an *express written agreement*, signed by the employee, *cannot* be overcome by proof of an implied contrary understanding." *Id.* at 340 n.10 (emphasis in original).

In this case, there is no *express written agreement* governing Melbye's entitlement to post-termination commissions.[3] Rather, there is only an alleged oral agreement (supported by the May 19, 2003 email and the December 10, 2008 letter) promising post-termination commissions and several written *policies* to the contrary. In *Guz*, the California Supreme Court noted that while the disclaimer language in an employee handbook or policy manual could not be ignored, it does not necessarily mean that it creates a binding contract. *Id.* at 340. Rather, the Court considered a number of factors, including: (1) whether the plaintiff understood the policy to apply to him; (2) whether he received individual promises or representations that he will not be fired except for good cause, and (3) whether there was a practice in the company's industry to provide secure employment. *See id.* at 339-43. Applying these factors in this case, there are at least genuine issues of material fact as to whether the written policies applied to Melbye. First, Melbye indicates that he was reassured by Knapp that the Employee Handbook did not apply to him. (*See* Melbye Decl. ¶ 15; *see also* Knapp Depo. 47:4-23.) As for the Incentives Document, Melbye indicates that he was not aware of it until this lawsuit. (*See* Melbye Decl. ¶ 20.) Second, Melbye declares that he did receive individual promises and representations from Knapp, and Knapp has acknowledged that he made and re-affirmed those promises to Melbye on numerous occasions. (*See* Melbye Decl. ¶ 13; Knapp Depo. 44:4-24, 47:14-23.) Third, according to Knapp, there was a practice at CAM Commerce of employees agreeing to lower salaries and being promised long-term commissions. (*See* Knapp Depo. 42:1-43:22; *see also* Awrey Decl., Ex. G.)

Defendant's reliance on California Court of Appeal's decision in *Nein v. HostPro, Inc.*, 174 Cal. App. 4th 833 (2009), is inapposite. In *Nein*, the Court of Appeal affirmed summary

---

[3] Neither party appears to contend that the COC Agreement controls this case. Melbye argues that the COC Agreement was unconscionable to the extent it allowed the new CEO to unilaterally terminate the agreement. Moreover, he contends the existence of the unilateral termination provision amounted to a mutual mistake of fact, thereby presumably voiding the agreement. Defendant, for its part, does not rely on the agreement because it itself terminated the agreement before terminating Melbye. In any event, even if the COC Agreement controlled, the Court notes that the agreement specifically provides that it does not prevent or limit Melbye's participation in "any benefit, bonus, incentive or other plan or program provided by the Corporation or any of its affiliated companies and for which [Melbye] may qualify." (COC Agreement § 8.) The COC Agreement further provides that "amounts which are vested benefits or which [Melbye] is otherwise entitled to receive under any plan or program of the Corporation or any of its affiliated companies at or subsequent to the Date of Termination shall be payable in accordance with such plan or program." (*Id.*) This presumably leaves intact any prior agreement (or lack thereof) for post-termination commissions.

1  judgment for the employer where there was an express written employment agreement providing
2  that the plaintiff would not receive commission after termination. *Id.* at 850. In this case,
3  however, there is no express written employment agreement governing Melbye's entitlement to
4  post-termination commissions. Rather, there are only written policies which, accepting Melbye's
5  representations as true, are not applicable to him.[4] *See Guz*, 24 Cal. 4th at 339-40.

6  Overall, the conflicting evidence in this case raises genuine issues of material fact as to the
7  "actual mutual understanding [of the parties] on particular terms and conditions of employment."
8  *See id.* at 337. Specifically, viewing the facts in the light most favorable to Melbye, such evidence
9  "logically permits conflicting inferences," *see id.*, thereby making summary judgment improper.

10  For the foregoing reasons, the Court concludes that despite the written policies in place,
11  there are genuine issues of material fact as to whether there was a valid oral or implied-in-fact
12  agreement between CAM Commerce and Melbye, and whether the company breached it. As such,
13  the Court **DENIES** Defendant's motion for summary judgment as to the first cause of action.

14  **II.     Unconscionable contract**

15  Melbye's second cause of action alleges that a contract requiring continued employment
16  for receipt of commissions is unconscionable. California cases analyze unconscionability as
17  having two separate elements: "procedural" and "substantive." *See, e.g.*, *Vance v. Villa Park*
18  *Mobilehome Estates*, 36 Cal. App. 4th 698, 709 (1995); *Shaffer v. Super. Ct.*, 33 Cal. App. 4th 993,
19  1000 (1995). "Procedural" unconscionability involves "(1) 'oppression,' which refers to an
20  inequality of bargaining power giving no meaningful choice to the weaker party or (2) the
21  'surprise' of a contractual term hidden in a printed or complex document." *Shaffer*, 33 Cal. App.
22  4th at 1000 (citation omitted). "Substantive" unconscionability, on the other hand, refers to an
23  "overly harsh allocation of risks or costs which is not justified by the circumstances under which
24  the contract was made." *Id.* (citation and internal quotation marks omitted). A showing of both

---

[4] For the same reason, both *Wal-Noon Corporation v. Hill*, 45 Cal. App. 3d 605, 613 (1975) ("There cannot be a valid, express contract and an implied contract, each embracing the same subject matter, existing at the same time."), and *Lance Camper Manufacturing Corporation v. Republic Indemnity Company of America*, 44 Cal. App. 4th 194, 203 (1996) ("[I]t is well settled that an action based on an implied-in-fact or quasi-contract cannot lie where there exists between the parties a valid express contract covering the same subject matter."), are inapposite due to the genuine issues of material fact as to the existence and applicability of any express written contract to Melbye.

"procedural" and "substantive" unconscionability at the time the contract was made is usually required, *see A & M Produce Co. v. FMC Corp.*, 135 Cal. App. 3d 473, 487 (1982), although California courts have at times applied a sliding scale instead. *See Am. Software, Inc. v. Ali*, 46 Cal. App. 4th 1386, 1390-91 (1996) (citing cases).

Melbye has not filed an opposition to this part of Defendant's motion for summary judgment. In any event, Defendant is entitled to summary judgment on this issue. There is no indication that the inequality in bargaining power and oppression in this case were so strong as to "shock the conscience." *See Cal. Grocers Ass'n v. Bank of Am.*, 22 Cal. App. 4th 205, 214 (1994). Moreover, there is no indication that requiring continued employment to receive commissions amounts to an "overly harsh allocation of risks or costs which is not justified by the circumstances under which the contract was made." *See Shaffer*, 33 Cal. App. 4th at 1000 (citation and internal quotation marks omitted); *see also Am. Software*, 46 Cal. App. 4th at 1393-94 (concluding that a provision in plaintiff's employment contract which terminated her right to receive commissions on payments received on her accounts 30 days after termination was not unconscionable). Thus, the Court **GRANTS** Defendant's motion for summary judgment as to the second cause of action.

### III.     Prevention of performance

Melbye's third cause of action alleges prevention of performance. Melbye has not filed an opposition to this part of Defendant's motion. Moreover, as indicated earlier, Melbye was an at-will employee, and therefore Defendant's termination of him was not, as a matter of law, improper prevention of performance. Accordingly, the Court **GRANTS** Defendant's motion for summary judgment as to the third cause of action.

### IV.     Good faith and fair dealing

The fourth cause of action alleges breach of the covenant of good faith and fair dealing. The implied covenant of good faith and fair dealing is "designed to effectuate the intentions and reasonable expectations of parties reflected by mutual promises within the contract." *Silvinsky v. Watkins-Johnson Co.*, 221 Cal. App. 3d 799, 806 (1990) (citing *Foley*, 47 Cal. 3d at 68-84). Defendant's sole argument why summary judgment should be granted on this cause of action is based on *Nein*, 174 Cal. App. 4th at 852, which dismissed a similar claim where "the express terms

of the agreement . . . permitted defendant to deny plaintiff further commissions after his termination." In this case, however, the Court already concluded that there are genuine issues of material fact as to whether Defendant could deny Melbye post-termination commissions. Accordingly, summary judgment on Melbye's fourth cause of action is inappropriate at this time, and the Court **DENIES** the motion in this regard.

**V.  Unjust enrichment**

Melbye's fifth cause of action alleges unjust enrichment. However, "there is no cause of action in California for unjust enrichment." *Melchior v. New Line Prods., Inc.*, 106 Cal. App. 4th 779, 793 (2003); *accord McKell v. Wash. Mut., Inc.*, 142 Cal. App. 4th 1457, 1490 (2006). Rather, unjust enrichment is "synonymous with restitution." *Melchior*, 106 Cal. App. 4th at 793.

Melbye attempts to save this cause of action by arguing that it is sufficient to allege a common count for assumpsit (services rendered) or quantum meruit (reasonable value of services rendered). However, because Melbye has not alleged either of these claims in his complaint, the Court **GRANTS** Defendant's motion for summary judgment as to the fifth cause of action. *See id.*

**VI.  Unfair competition**

The sixth cause of action alleges a violation of California's UCL. California courts have held that "where the employer's policy or practice is forbidden by or found to violate the Labor Code, it may also be held to constitute an 'unlawful business practice' subject to redress" under Section 17200 of the California Business and Professions Code. *See Application Group, Inc. v. Hunter Group, Inc.*, 61 Cal. App. 4th 881, 908 (1998) (citing cases). In this case, Defendant's only argument is that this claim is duplicative of Melbye's other claims for post-termination commissions, and therefore fails because he is not entitled to those commissions as a matter of law. Because there are genuine issues of material fact as to whether Melbye is entitled to post-termination commissions, summary judgment is also inappropriate as to this cause of action. Accordingly, the Court **DENIES** Defendant's motion as to the sixth cause of action.

**VII.  Failure to pay "wages" under the Labor Code and Labor Code penalties**

Melbye's seventh cause of action alleges that Defendant failed to pay "wages" under the California Labor Code. His eighth cause of action seeks penalties under the Labor Code.

1  Defendant's only argument is that these causes of action rely on Melbye's argument that he is
2  entitled to post-termination commissions.  Because Melbye has raised genuine issues of material
3  fact as to his entitlement to post-termination commissions, summary judgment is not proper as to
4  these causes of action at this time.  Accordingly, the Court **DENIES** Defendant's motion for
5  summary judgment as to the seventh and eighth causes of action.

6  **VIII.   Declaratory relief**

7        The Court also **DENIES** Defendant's motion for summary judgment as to the ninth cause
8  of action seeking declaratory relief because it hinges on the same grounds as Melbye's first cause
9  of action and Defendant does not make any separate argument for summary judgment.

10  **CONCLUSION**

11        For the foregoing reasons, the Court **GRANTS IN PART and DENIES IN PART**
12  Defendant's motion for summary judgment.  Specifically, because Melbye has sufficiently
13  demonstrated genuine issues of material fact as to his entitlement to post-termination commissions,
14  the Court **DENIES** Defendant's motion as to the first, fourth, sixth, seventh, eighth, and ninth
15  causes of action.  On the other hand, for the reasons set forth above, the Court **GRANTS**
16  Defendant's motion as to the second, third, and fifth causes of action.

17        **IT IS SO ORDERED.**
18  **Date:  January 11, 2012**

19  **IRMA E. GONZALEZ, Chief Judge**
    **United States District Court**